# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ARMANDO B. CORTINAS, JR., | Case No.: 3:10-cv-00439-LRH-WGC |
| Petitioner, | **ORDER** |
| v. | |
| JO GENTRY, et al., | |
| Respondents. | |

**I.    INTRODUCTION**

Petitioner Armando B. Cortinas, Jr. filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. This matter is before this Court for adjudication of the merits of Cortinas' counseled amended petition ("Amended Petition"). For the reasons discussed below, this Court denies the Amended Petition, grants a certificate of appealability for Ground 1 only, and directs the Clerk of the Court to enter judgment accordingly.

**II.    BACKGROUND**

Cortinas' convictions are the result of events that occurred in Clark County, Nevada, on or about April 15, 2003. ECF No. 11-2. In its order affirming Cortinas' convictions, the Nevada Supreme Court described the crime, as revealed by the evidence at Cortinas' trial, as follows:

> On April 20, 2003, Kathryn Kercher's nude body was discovered in the desert south of Boulder City in an advanced stage of decomposition. Two clumps of blond hair

were lying adjacent to the body, one of which appeared to have been cut from Kercher's head. Three stab wounds appeared on Kercher's back.

An autopsy revealed hemorrhages in various areas of Kercher's neck and at the base of her tongue. From this, the pathologist determined that Kercher died from asphyxia due to strangulation. According to the pathologist, prolonged strangulation with a ligature could have produced a distribution of hemorrhaging consistent with Kercher's wounds, assuming that Kercher struggled with her attacker, thus causing the ligature to move as it was held to her neck.

Shortly after Kercher's body was discovered, officers from the Las Vegas Metropolitan Police Department responded to a call that appellant Armando Cortinas was attempting to commit suicide. Cortinas approached the responding officers briskly. He then asked to be placed in handcuffs. While restrained, Cortinas stated that he wanted to kill himself, prompting police to call an ambulance.

When police officers asked him why he wanted to commit suicide, Cortinas stated that he had done something bad that he could not live with—he had killed a prostitute. Cortinas then stated that he dumped the victim's body in the desert near Boulder City and described the victim's tattoos. After the officers confirmed the victim's description with Boulder City Police, Cortinas was arrested.

Following his arrest, Cortinas consented to a search of his bedroom and volunteered that police would find the victim's earrings in a coin bank on his dresser. During the search, police recovered the earrings and, among other things, a 10- to 12-inch steel cable PVC pipe cutter with yellow handles attached at either end tucked between Cortinas' mattress and box spring. Cortinas later described this tool as a "garrote" that could be used for strangling.

During an interview, Cortinas' brother told police that Cortinas had a girlfriend over to the house a week earlier. At some point, the brother heard the girl scream, thought that the two were horseplaying, and told Cortinas to keep it down. In response, Cortinas turned up his music volume. Later, when he emerged from his bedroom, Cortinas told his brother that the girl had passed out and that he would use her car to take her home, then travel back on the bus.

At the police station after his arrest, Cortinas confessed to killing Kercher. Cortinas told police officers that he used his father's cellular phone to respond to a message advertisement in CityLife magazine and arranged to meet with Kercher at his parents' home. When she arrived, Cortinas paid Kercher $150 for oral sex. Afterward, Cortinas approached Kercher from behind and, before she could scream, looped a nylon lanyard keychain "in a figure eight sort of manner" around her neck. In this fashion, Cortinas said that he strangled Kercher for nearly an hour, stopping at intervals to determine if she was still breathing and resuming if necessary "to finish it off." Finally, unable to kill Kercher by strangulation, Cortinas wrapped his arm around her, fell backwards onto his bed, and broke her neck.

According to Cortinas' confession, even this final attempt to take Kercher's life failed, as Kercher was still gasping for air. Despite her attempts to breathe, Cortinas taped Kercher's skirt around her head to absorb the blood that had begun to issue from her mouth. He then taped her wrists together in front of her body. With Kercher bound in this manner, Cortinas placed Kercher in the trunk of her car and drove to the Boulder City desert. Unsure that she was dead when he arrived in the desert, Cortinas stabbed Kercher three times in the back with a butterfly knife, so that she would "drown in her own blood" as it pooled in her lungs. Using the same knife, Cortinas then removed the skirt that he had taped around Kercher's head, cutting away clumps of her hair in the process.

Returning from Boulder City, Cortinas disposed of the lanyard, knife, and other evidence in different parts of Las Vegas and Henderson and parked Kercher's car around the corner from his parents' house. Before discarding Kercher's purse, Cortinas recovered his $150 as well as a bag of marijuana, which he later sold. Although he discarded Kercher's other jewelry, he kept her diamond earrings, eventually placing then in his coin bank. The next day, Cortinas moved Kercher's car to the Stratosphere Hotel and then offered it to a friend if the friend would agree to burn the car's contents to destroy his fingerprints.

The subsequent investigation further confirmed Cortinas' connection to the killing. In particular, the police confirmed that Kercher's DNA matched the DNA found on the earrings recovered from Cortinas' coin bank, a CityLife advertisement had recently run with Kercher's telephone number, and a call had been placed to that number from Cortinas' father's phone on the night that Kercher was killed.

ECF No. 13-28 at 5-8.

Following a jury trial, on May 22, 2006, Cortinas was found guilty of first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon. ECF No. 13-2. On July 27, 2006, Cortinas was sentenced to life without the possibility of parole for the first-degree murder conviction plus an equal and consecutive term of life without the possibility of parole for the deadly weapon enhancement, and 26 to 120 months for the robbery conviction plus an equal and consecutive term of 26 to 120 months for the deadly weapon enhancement. ECF No. 13-8. Cortinas appealed, and the Nevada Supreme Court affirmed on October 30, 2008. ECF No. 13-28. The Nevada Supreme Court denied Cortinas' petition for rehearing and for en banc

reconsideration. ECF Nos. 13-33, 14-1. Cortinas filed a petition for a writ of certiorari on August 17, 2009. ECF No. 14-2. The Supreme Court of the United States denied Cortinas' petition on October 20, 2009. ECF No. 14-3.

Cortinas filed a state habeas petition on January 9, 2010. ECF No. 14-5. The state district court denied Cortinas' petition on July 6, 2010. ECF No. 14-11. On August 22, 2013, Cortinas moved for the state district court to correct his illegal sentence. ECF No. 14-15 at 9. The state district court denied the motion on October 3, 2013. ECF No. 14-22. Cortinas appealed, and the Nevada Supreme Court affirmed on April 10, 2014. ECF No. 14-26.

Cortinas initiated this action on July 16, 2010, by filing a pro se document entitled "Application for Certificate of Appealability." ECF No. 1-2. An internal docketing notation dated October 26, 2010, indicates that this Court was unable to locate the case referenced by Cortinas in his motion for a certificate of appealability. The notation further indicates that the Clerk's Office would send Cortinas a letter "requesting a case number." On November 1, 2010, the Clerk closed this action and sent Cortinas a letter with habeas forms attached. Neither the Court nor the Clerk's Office has retained a copy of these letters sent to Cortinas, and the docketing notations do not reflect what was stated therein.

Four years later, on September 22, 2014, Cortinas filed a federal habeas petition, which was assigned case number 2:14-cv-01549-RFB-CWH. Following a motion to dismiss by the Respondents in case number 2:14-cv-01549-RFB-CWH, the court in that case appointed the Federal Public Defender ("FPD") to represent Cortinas and ordered the FPD to file an amended petition. Instead of filing an amended petition, the FPD moved to stay case number 2:14-cv-01549-RFB-CWH on the grounds that Cortinas' claims should be litigated in the instant, earlier filed action (case number 3:10-cv-00439-LRH-WGC). The court in case number 2:14-cv-01549-

RFB-CWH granted Cortinas' motion for stay and administratively closed case number 2:14-cv-01549-RFB-CWH.

On March 22, 2017, in the instant action, the FPD moved for the appointment of counsel, moved for leave to file an amended petition, and filed an Amended Petition. ECF Nos. 4, 5, 6. This Court ordered Cortinas to file a supplemental brief and appointed the FPD to represent Cortinas. ECF No. 23. Cortinas filed a supplemental brief in support of his motion for leave to file an amended petition on March 14, 2018. ECF No. 30.

Following review of both cases (case numbers 3:10-cv-00439-LRH-WGC and 2:14-cv-01549-RFB-CWH), the assigned judges determined that consolidation of the actions was appropriate. ECF No. 38. On July 13, 2018, case number 2:14-cv-01549-RFB-CWH was consolidated into this case, with this case being the base case. *Id.* On July 17, 2018, this Court reopened this action and granted Cortinas' motion for leave to file an amended petition. ECF No. 40. Accordingly, this Court ordered that Cortinas' Amended Petition filed on March 22, 2017, will be the operative petition in this case. *Id.* The Respondents answered Cortinas' Amended Petition on November 8, 2018. ECF No. 45. Cortinas replied on January 16, 2019. ECF No. 50.

Cortinas asserts the following violations of his federal constitutional rights:

1. The state district court authorized the jury to convict him under an invalid legal theory.
2. The state district court failed to suppress his unwarned and/or involuntary statements to the police.
3. The jury venire did not represent a fair cross section of the community.

ECF No. 6.

## III.   STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing

6

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV.   DISCUSSION

### A.   Ground 1

In Ground 1, Cortinas alleges that his federal constitutional rights were violated because the state district court authorized the jury to convict him under an invalid legal theory in violation of his Sixth and Fourteenth Amendment rights. ECF No. 6 at 12. Cortinas elaborates that the State charged him with first-degree murder under two theories of liability: willful, deliberate, and premeditated murder and felony murder. *Id.* However, felony murder was an invalid theory, as Cortinas only decided to take items from the victim after she died. *Id.* Cortinas contends that the invalid felony murder theory had a substantial and injurious effect on the verdict because the evidence of premeditation and deliberation was weak due to the fact that he maintained that the murder was unplanned and impulsive during his confession. *Id.* at 17. Instead, Cortinas contends that it is much more likely the jury relied on the undisputed, invalid felony murder theory in convicting him. ECF No. 50 at 32.

In Cortinas' appeal of his judgment of conviction, the Nevada Supreme Court held:

We begin our analysis by considering the district court's refusal to give Cortinas' requested jury instruction advising that afterthought robbery may not serve as a predicate felony for felony murder. Cortinas challenges this decision, asserting that his requested instruction correctly stated the legal limitations on the use of robbery to seek a first-degree murder conviction under the felony-murder rule.

District courts have broad discretion to settle jury instructions. While we normally review the decision to refuse a jury instruction for an abuse of discretion or judicial error, we review de novo whether a particular instruction, such as the one at issue in this case, comprises a correct statement of the law.

While this appeal was pending, we decided *Nay* and joined the majority of jurisdictions that prohibit the use of an afterthought robbery as a predicate felony for felony murder. . . . Based on this clarification of the felony-murder rule as it relates to robbery, we concluded that failing to give the proposed instruction in *Nay* amounted to judicial error.

Similar to the instruction proposed in *Nay*, Cortinas' proposed instruction on felony murder required the jury to find that he intended to commit the robbery before he mortally wounded the victim. This, we conclude, accurately corresponds to the clarification in *Nay* regarding the necessary timing of the intent to commit a robbery to satisfy the felony-murder rule. Applying *Nay*'s understanding of the felony-murder doctrine to this case, we conclude that Cortinas was entitled to his correctly framed felony-murder instruction. Having concluded that instructional error occurred in this case, we next consider that error in light of the rule set forth in *Stromberg v. California* and determine whether such errors are subject to harmless-error review.

In *Stromberg*, the United States Supreme Court held that a conviction must be reversed when the jury is presented with multiple theories of liability, one of which is unconstitutional, and it is impossible to discern from the verdict which ground the jury used to determine the defendant's guilt. Since *Stromberg* was decided, the Court has extended it beyond unconstitutional theories of liability to situations in which the jury returns a general verdict based on multiple theories of liability, one of which is legally invalid. We recognize that the misdescription or omission in the felony-murder instruction in this case arguably gives rise to a *Stromberg* scenario in that the jury was presented with multiple theories and the erroneous instructions allowed for a conviction based on an invalid theory of felony murder.

ECF No. 13-28 at 9-12 (internal footnotes omitted). The Nevada Supreme Court then "conclude[d] that *Stromberg* error is . . . instructional trial error" and, "[a]s such, *Stromberg* error is amenable to harmless-error review." *Id.* at 17. The Nevada Supreme Court then applied harmless-error review:

Having concluded that *Stromberg* error is subject to harmless-error review, the appropriate standard is that articulated in *Chapman*—whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." We therefore must consider whether the instructional error in this case

is harmless beyond a reasonable doubt. Unlike in *Nay*, we conclude beyond a reasonable doubt that the error in this case is harmless.

. . . As in *Nay*, the State charged Cortinas with first-degree murder and robbery, with respective deadly weapon enhancements. For purposes of robbery, the jury was properly instructed that the taking of the victim's property could occur as an afterthought to the use of force; the district court, however, rejected Cortinas' proposed instruction on felony murder that would have restricted the jury from using an afterthought robbery to reach a first-degree felony-murder verdict. Taking advantage of the permissive space that resulted, during closing arguments, the prosecutor simplified the jury's felony-murder reasoning to the same if-then analysis urged by the prosecutor in *Nay*:

> The defendant takes his money back. He takes the earrings. He takes the car. It doesn't matter whether he said, you know, I want to kill her because I want to see what it's like . . . to plunge a knife into somebody . . . [o]r . . . you know, I want to get my money back . . . I want to get those earrings, and then during the use of that force or afterwards taking advantage of that killing he takes them back, and it's still a robbery, it's still a felony murder, and the defendant is guilty either way of first-degree murder under the felony-murder rule.

Thus, like the prosecutor's logic in *Nay*, the prosecutor's closing remarks in this case rested on a flawed premise—that for purposes of felony murder it is irrelevant whether the defendant intended to rob the victim before using the force that led to the victim's death.

Consistent with our harmless-error review in *Nay*, we reiterate "that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." More specifically, in reviewing *Stromberg* error for harmlessness, we are not confined to considering whether the jury actually determined guilt under a valid theory, but may look beyond what the jury actually found to what a rational jury would have found if properly instructed. Thus, the evidence presented to the jury and the jury's other findings are relevant to our harmless-error review.

The similarity between *Nay* and this case ends when we turn to the facts and evidence presented. Although Cortinas contended at trial that the murder was impulsive and thus not deliberate and premeditated, the evidence overwhelmingly demonstrates the contrary. Cortinas confessed to the killing—twice—and led authorities to Kercher's body. He admitted that he strangled Kercher for over an hour, relenting at times only to determine if she had finally stopped breathing. Failing to kill Kercher after an hour, he changed course and broke her neck. Then, after binding Kercher's head and wrists and transporting her to the desert, Cortinas

further ensured her death by stabbing her in the back three times for the admitted purpose of flooding her lungs with blood.

Based on this evidence alone, we conclude that a rational jury would have found that the murder was willful, deliberate, and premeditated. Nevertheless, the evidence also suggests that Cortinas had long contemplated strangling a victim and killed Kercher to satisfy his own morbid curiosity. Perhaps most notably, in contrast to *Nay*, Cortinas did not claim self-defense, let alone attempt to minimize his responsibility for this crime. Moreover, turning to the actual verdict in this case, the jury found that Cortinas had committed this killing with a deadly weapon, a ligature, which he held to Kercher's neck for over an hour before finally deciding to break her neck with his hands. As we have noted previously, the use of a ligature and the time required to strangle a person are legitimate circumstances from which to infer that a killing is willful, deliberate, and premeditated. Based on the evidence, we can confidently say beyond a reasonable doubt that presenting the invalid felony-murder theory to the jury in this case was harmless.

*Id.* at 22-27 (internal footnotes omitted). The Nevada Supreme Court's rejection of Cortinas' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

During his formal police interview, Cortinas explained that he contacted a prostitute from a magazine and after their sexual encounter, he strangled her with a keychain lanyard after she returned from using the restroom. ECF No. 14-29 at 9, 11. Cortinas estimated that he strangled the victim "for like almost . . . a whole hour." *Id.* at 13. "[W]hen [the victim] stopped moving[, Cortinas] let go and once [he] heard her breath, gasp for air[, he] choked her again . . . just to finish it off." *Id.* at 13-14. However, because she was still breathing, Cortinas then put masking tape around her head and arms and taped her skirt around her head to "keep the blood, any blood from spilling on [his] floor." *Id.* at 15. The victim then managed to get up, and Cortinas "wrapped [his] arm around her and fell back on [his] bed" and "broke her neck." *Id.* at 14.

Cortinas waited for his family to fall asleep, and then he carried the victim to her vehicle and placed her in the trunk. *Id.* at 14. Cortinas drove the victim's vehicle to the desert and "just

drop[ped] her body." *Id.* at 17-18. Cortinas used a knife to cut the tape off the victim because he "wasn't wearing any gloves or anything when [he] . . . put anything on her." *Id.* at 19. Cortinas then stabbed her three times "to slow her down, um, maybe it might make her choke on her own, drown in her own blood." *Id.* at 20. Cortinas left the desert and dumped the victim's clothes, his pants, his boots, and the knife "in different parts of town." *Id.* at 25-26. Cortinas took the victim's marijuana, her diamond earrings, and the money he had previously paid to her. *Id.* at 30-31. A few days later, Cortinas "had a friend torch her car." *Id.* at 7. Cortinas indicated that he "wasn't planning on killing" the victim; rather, Cortinas indicated that "it was not planned, it was not, you know, premeditated. . . . I don't think it through, it just happens . . . I lash out . . . I do things that, I don't think about it. I never think twice about it, I just do it." *Id.* at 5, 9-10.

Cortinas was indicted for murder with the use of a deadly weapon "under one or more of the following principles of criminal liability, to-wit: (1) by having premeditation and deliberation in its commission; and/or (2) the killing occurring during the perpetration or attempted perpetration of a robbery." ECF No. 11-2. Prior to his trial, Cortinas moved to strike the felony murder allegation because "[t]he purported robbery was merely an afterthought to the homicide." ECF No. 8-9 at 4. The state district court denied the motion without explanation. ECF No. 9-13 at 8; ECF No. 9-15.

Later, Cortinas requested that the state district court instruct the jury as follows:

> If you find that the defendant formed the design to take property from the decedent after the decedent was mortally wounded, you must find that the killing did not occur in the perpetration of a robbery. If you have a reasonable doubt whether the defendant formed an intent to steal before the decedent was mortally wounded, you are instructed that you must find that the killing did not occur in the perpetration of a robbery.

ECF No. 14-31 at 3. Cortinas argued, "[i]f the Court is not inclined to strike the felony-murder language from the indictment or proffer an advisory verdict of acquittal as to that allegation, the Court, at a minimum, must" use his proposed instruction. *Id.* The state district court denied Cortinas' request. ECF No. 12-4 at 122.

The jury's verdict does not indicate which theory of liability it used to find Cortinas guilty of murder with the use of a deadly weapon. *See* ECF No. 13-2 at 2. In fact, the jury was instructed that "even if you cannot agree on whether the facts establish premeditated and deliberate murder or felony murder, so long as all of you agree that the evidence establishes Defendant's guilt of murder in the first degree, your verdict shall be Murder of the First Degree." ECF No. 13 at 13.

"[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978); *see also Stromberg v. California*, 283 U.S. 359, 368 (1931) ("[I]f any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld."); *Skilling v. United States*, 561 U.S. 358, 414 (2010) (explaining in a parenthetical that *Yates* stands for the proposition that "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory"). "[E]rrors of the *Yates* variety are subject to harmless-error analysis." *Skilling*, 561 U.S. at 414. As such, "a reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *see also Davis v. Ayala*, 135 S.Ct. 2187, 2198 (2015) ("[T]he *Brecht* standard 'subsumes' the

requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*."). The relevant question in these circumstances "is 'not simply whether [this Court] can be reasonably certain that the jury *could* have convicted [the petitioner] based on the valid theory [of liability],' but whether '[this court] can be reasonably certain . . . that the jury *did* convict [him] based on the valid . . . theory.'" *Riley v. McDaniel*, 786 F.3d 719, 726 (9th Cir. 2015) (emphases in original) (quoting *Babb v. Lozowsky*, 719 F.3d 1019, 1035 (9th Cir. 2013), *overruled on other grounds by Moore v. Helling*, 763 F.3d 1011, 1021 (9th Cir. 2014) (concluding that *Babb* was overruled "only as to its holding that the state court's failure to apply the *Byford* instruction to Babb's conviction . . . was contrary to clearly established federal law")).

The Respondents concede that the Nevada Supreme Court correctly concluded that the state district court erred in rejecting Cortinas' felony-murder rule instruction. ECF No. 45 at 7. Indeed, Cortinas was entitled to a jury instruction based on his defense that he was not guilty of felony murder because he did not form the intent to rob the victim until after her death. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *see also Nay v. State*, 123 Nev. 326, 333, 167 P.3d 430, 435 (2007) ("Robbery does not support felony murder where the evidence shows that the accused kills a person and only later forms the intent to rob that person."). Accordingly, as the Nevada Supreme Court reasonably concluded that the state district court erred, the question before this Court is whether this error was harmless.

Cortinas contends that his statements during his confession that the murder was impulsive cannot lead to a finding that the jury relied on a premeditation theory of liability, especially since

the jury would have had to have believed the rest of his confession statements in order to convict him. ECF No. 50 at 22. However, contrary to Cortinas' statements during his confession about the impulsivity of his acts, as the Nevada Supreme Court reasonably noted, the evidence presented at the trial overwhelming demonstrates that the killing was premeditated. ECF No. 13-28 at 26. Cortinas strangled the victim "for like almost . . . a whole hour." ECF No. 14-29 at 13. During that time, Cortinas let the victim go when she stopped moving, but he began choking her again once he heard her "gasp for air." *Id.* at 13-14. Because the victim managed to get up after Cortinas attempted to strangle her, he then attempted to break her neck. *Id.* at 14. Finally, after driving the victim to the desert, Cortinas stabbed the victim three times to make her "drown in her own blood." *Id.* at 20. These circumstances confirm that Cortinas' killing of the victim was willful, deliberate, and premeditated. *See* ECF No. 13 at 10 (jury instructions defining a willful, deliberate, and premeditated killing). As such, it can be concluded that the jury convicted Cortinas on the valid willful, deliberate, and premeditated theory of liability, *Riley*, 786 F.3d at 726, such that the state district court's failure to give Cortinas' felony-murder instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (1993); *see also Babb*, 719 F.3d at 1035 (holding that it was "reasonably certain . . . that the jury did convict [the petitioner] based on the valid felony murder theory and that the [invalid] premeditation instruction did not have a substantial impact on the jury's decision").

Cortinas is denied federal habeas relief for Ground 1.

**B.     Ground 2**

In Ground 2, Cortinas alleges that his federal constitutional rights were violated because the state district court failed to suppress his statements to the police in violation of his Fifth and Fourteenth Amendment rights. ECF No. 6 at 19. Cortinas first argues that he gave his first

confession before the police read him his *Miranda* rights, and as such, his confessions should be suppressed. *Id.* Cortinas next argues that he was heavily intoxicated at the time of his confessions, so he was unable to voluntarily waive his *Miranda* rights. *Id.*

In Cortinas' appeal of his judgment of conviction, the Nevada Supreme Court explained that Cortinas "argues that his statements to police . . . w[as] improperly obtained." ECF No. 13-28 at 31 n.76. However, after "[h]aving carefully considered th[is] contention[ ], [the Nevada Supreme Court] conclude[d] that [it did not] warrant reversal." *Id.* Because the Nevada Supreme Court's opinion "does not come accompanied with [the] reasons" why it denied this ground, this Court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018). This Court "then presume[s] that the unexplained decision adopted the same reasoning." *Id.*

Prior to trial, Cortinas moved to suppress his confessions. ECF No. 10-1. The state district court determined that a hearing was necessary to rule on the motion. ECF No. 10-5 at 4-5. At a hearing, Cortinas' brother testified that on April 21, 2003, about a week after the murder, he called the police because Cortinas "tried to grab a knife to commit suicide." ECF No. 10-15 at 87-88. Cortinas' mother confirmed that Cortinas threatened to kill himself on the morning of April 21, 2003. *Id.* at 108.

Officer Edward Reese testified that he responded to the dispatch call and when he arrived at Cortinas' residence, Cortinas came out of the residence and told Officer Reese, "go ahead and put me in cuffs" because "he felt that he was a danger." ECF No. 11-4 at 9-10. Officer Reese put Cortinas in handcuffs because Officer Reese was the initial officer present and dispatch had indicated that Cortinas had a knife. *Id.* at 13. Officer Reese told Cortinas "that he wasn't under arrest" and "asked him what was going on." *Id.* at 11. Cortinas responded that "he wanted to kill

himself." *Id.* Officer Reese then "requested medical do a Legal 2000" and told Cortinas that an ambulance would be coming to "take him to a hospital to get some help" and that "he wasn't under any trouble." *Id.* Officer Reese testified that even if he was not the sole officer present, he would not have taken the handcuffs off Cortinas after Cortinas made the statement that he wanted to kill himself. *Id.* at 13-14.

Officer Samuel Underwood, who, like Officer Reese, was in uniform and was carrying his weapon, was the second officer to arrive at Cortinas' residence. ECF No. 10-15 at 11-12, 21. When he arrived, Cortinas was in handcuffs, was distraught, and "was talking about hurting himself, and he didn't want to live on." *Id.* at 13, 22. Officer Underwood "started to talk to him because [he] didn't . . . understand why a young man would want to hurt himself." *Id.* at 13. Cortinas responded "that he did something terrible, and he just can't deal with it no more." *Id.* at 14. After Officer Underwood talked to Cortinas "for a few minutes" and told him that they "were going to get him help," Cortinas "came out and said [he] killed a prostitute." *Id.* at 14-15, 24. At that time, Officer Underwood "did [not] know whether or not he had actually committed a crime or if he was talking about a real crime." *Id.* at 15. Officer Underwood "wanted to find out . . . if [Cortinas] was telling the truth" about committing a crime, and in response to follow-up questions by Officer Underwood, Cortinas explained that the victim had two tattoos. *Id.* at 26. At that point, a call was made to the Boulder City Police to inquire about a victim Officer Underwood had seen on the news the night before. *Id.* at 15, 25, 27.

Once Officer Underwood "realized [Cortinas] was talking about an actual crime," he "instantly Mirandized him." *Id.* at 15. Officer Underwood read Cortinas his rights, and Cortinas indicated that he understood. *Id.* at 16. Cortinas then "basically started to tell [Officer Underwood] what he did, . . . the steps how he did it, how he got the prostitute to his house, what

he did afterwards." *Id.* In fact, Cortinas explained that he summoned the victim to his house, requested sexual favors in exchange for money, paid the victim for oral sex, and then spent some time in his room after killing her. *Id.* at 28-30. During this time, Cortinas was answering Officer Underwood's questions appropriately, was making sense, did not appear drunk or high, and appeared oriented as to time and dates. *Id.* at 16-17. Officer Underwood transported Cortinas to the Metro Homicide Office, and in the interview room, Officer Underwood told Cortinas that "the detectives who were going to be taking the case would be able to help if he helps them." *Id.* at 31-32.

Detective Thomas Thowsen testified that he conducted Cortinas' formal police interview, which was discussed in Ground 1 *supra*, at the police station. ECF No. 10-15 at 36. Prior to commencing the interview, Detective Thowsen advised Cortinas of his constitutional rights. *Id.* at 36. Cortinas indicated that he understood his rights and stated that he was willing to be interviewed. *Id.* at 37. Cortinas did not appear to be under the influence of anything, as he was able to speak clearly, make eye contact, and articulate his answers. *Id.* Further, Cortinas "was very lucid, articulate in his answers" and would even "ask [Detective Thowsen] for [his] ink pen so he could draw and explain what he was talking about more clearly." *Id.* at 39. Cortinas' interview lasted approximately an hour and 35 minutes. *Id.* at 51.

Cortinas' blood was drawn following his police interview, and his blood alcohol content was ".022 nanograms per milliliter." ECF No. 10-15 at 38. Cortinas had consumed "three 32 ounces of Smirnoff Ice and a big 40 of Bud Light" from about 9:00 p.m. the previous night, April 20, 2003, until "about 3:00 or 4:00 o'clock in the morning" on April 21, 2003. *Id.* at 52-53. John Hiatt, Ph.D., testified that Cortinas' blood alcohol value would have been between 1.27 and 1.62 gram percent during Cortinas' initial interaction with Officers Reese and Underwood at

6:00 a.m. on April 21, 2003, and between .082 and .102 gram percent during Cortinas' formal interview at the police station at 9:00 a.m. on April 21, 2003. ECF No. 10-15 at 119-120.

After the presentation of the foregoing testimony and argument by the parties, the state district court held:

> When the defendant is taken into handcuffs, basically, what I can only describe with the testimony at his own request to be handcuffed - - which I'm not saying the police wouldn't have done it, anyway, based upon the circumstances - - clearly, it would be the appropriate thing to do if they were concerned that the defendant was a risk of harm to himself or others, but I don't think that I can agree with the analysis presented by the Defense in this case.
>
> I'm not suggesting that there aren't circumstances where someone who made statements in this situation weren't knowing and voluntary. I just don't think the facts support that in this case, even based upon a very complete briefing and presentation of NRS and facts in support of their request. I look at the totality of the circumstances. The police responded. He said put me in handcuffs. I don't know what I'll do. I'm distraught.
>
> They put him in handcuffs. They're not going to arrest him for suicide. They're going to get him some help. He clearly wants help as he states repeatedly throughout the day. Everyone saw what they saw on television.
>
> He could be one of those people that sees something on television and is ranting or raving or he could be someone responsible for the woman in the desert who was on the television the night before.
>
> I think it's clear based upon the testimony they gave this defendant every benefit of the doubt that, perhaps, he was ranting about something he saw on TV that he may not have actually done because, let's face it, after all - - during all of these statements that I've reviewed and from the testimony, he appears to be a rather cogent, articulate and remorseful while upset person. It doesn't go with prostitute in the desert.
>
> And I would suggest that I don't think there was anything inappropriate in this case as far as the officers go, but that really wasn't the focus of the Defense. The defense is because of - - at last my perception of their argument is not so much that anything inappropriate was done, but that, you know, by taking these statements, even if they would have Mirandized him in the beginning based upon . . . NRS 433A.145, et seq., it wouldn't have mattered, really, because he was not able to render a voluntary confession, and I cannot find that based upon the totality of the circumstances in this case. I find it was voluntary. I decline to suppress it.

1    There's many alternatives, and you can look at each theory individually which I
2    have done to suppress it and each together as a whole in light of all the others which
     I have done, and so I've done that, alternatively, and I deny the motion.

3    . . . Well, I think the record will speak for itself as far as them not having any
4    modicum of knowledge that he was a suspect in a homicide until such time as he
     told them I killed someone. And even then, they still weren't 100-percent sure that
5    that could be true because it was on TV last night, and maybe - - and what's
     interesting is they called Boulder City. They don't even call Metro Homicide.

6    They say, well, there's a body in Boulder City, and there's a defendant here that
7    talks about Boulder City. Well, let's call Boulder City. Is there a connection? I don't
     think they even automatically assumed it was true. But all of that aside, the bottom
8    line is I certainly will let the record reflect that you've made that argument. I've
     considered it, and the motion's denied.

9    ECF No. 11-5 at 11-14. This ruling was neither contrary to nor an unreasonable application of

10   clearly established law as determined by the United States Supreme Court.

11       Cortinas first contends that law enforcement should have read him his *Miranda* rights

12   prior to his first confession because he was in handcuffs, he was not free to leave, and law

13   enforcement questioned him after he said he had done something bad. ECF No. 6 at 21-22.

14   "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from

15   custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

16   effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436,

17   444 (1966). Custodial interrogation "mean[s] questioning initiated by law enforcement officers

18   after a person has been taken into custody or otherwise deprived of his freedom of action in any

19   significant way." *Id.* And "the term 'interrogation' under *Miranda* refers not only to express

20   questioning, but also to any words or actions on the part of the police (other than those normally

21   attendant to arrest and custody) that the police should know are reasonably likely to elicit an

22   incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

23

19

"[T]he ultimate inquiry" of whether someone is in custody "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); *see Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (holding that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*"). There are "[t]wo discrete inquiries" to determine whether an individual is in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Relevant factors in ascertaining how an individual would assess his freedom of movement "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted). The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

The state district court appears to have reasonably concluded that, based on the circumstances, the fact that Cortinas was put in handcuffs did not mean that he was in custody for purposes of *Miranda*. Indeed, the Ninth Circuit Court of Appeals has determined that "police conducting on-the-scene investigations involving potentially dangerous suspects may take precautionary measures if they are reasonably necessary." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982). Officer Reese testified that he put Cortinas in handcuffs for this very reason: Officer Reese was the sole officer present initially and he had been told by dispatch that

1  Cortinas had a knife and was threatening suicide. ECF No. 11-4 at 13. Further, Cortinas told

2  Officer Reese that he "felt that he was a danger" and wanted to kill himself. *Id.* at 9-11. These

3  circumstances demonstrate that the handcuffs were a reasonable, precautionary measure given

4  the circumstances, *Bautista*, 684 F.2d at 1289, such that the state district court reasonably noted

5  that handcuffing Cortinas "would be the appropriate thing to do if they were concerned that

6  [Cortinas] was a risk of harm to himself or others." ECF No. 11-5 at 11.

7       The state district court also appears to have reasonably concluded that the remainder of

8  the circumstances did not demonstrate that Cortinas was in custody at the time of his pre-

9  *Miranda* confession; rather, the state district court reasonably noted that the officers restrained

10  Cortinas merely "to get him some help." ECF No. 11-5 at 12. Cortinas was standing in front of

11  his residence while Officer Reese filed out the "Legal 2000 paperwork" and Officer Underwood

12  asked him why he was wanting to commit suicide. ECF No. 11-4 at 11; ECF No. 10-15 at 14-15.

13  At this time, Officer Reese had explained to Cortinas "that he wasn't under arrest," was not in

14  any trouble, and that help would be provided. ECF No. 11-4 at 11. After Cortinas indicated that

15  he had done something terrible, Officer Underwood continued to talk to Cortinas "for a few

16  minutes" before Cortinas made his confession. ECF No. 1015 at 14-15, 24. Cortinas' liberty may

17  have been somewhat restricted due to the handcuffs and the presence of two uniformed police

18  officers. However, based on the circumstances surrounding the interrogation—the needing to get

19  Cortinas help due to his threat of committing suicide with a knife—it cannot be determined that

20  the brief restriction lasting only a few minutes outside of Cortinas' own residence rose to the

21  level of being a "restraint on freedom of movement of the degree associated with a formal

22  arrest." *Beheler*, 463 U.S. at 1125; *see also Bautista*, 684 F.2d at 1289 ("A brief but complete

23

21

1    restriction of liberty, if not excessive under the circumstances, is permissible during a *Terry* stop

2    and does not necessarily convert the stop into an arrest.").

3         Additionally, although Officer Underwood continued to question Cortinas after Cortinas

4    said that he had done something terrible and after he admitted to killing a prostitute before giving

5    him a *Miranda* warning, it cannot be concluded that Officer Underwood's questions amounted to

6    an interrogation. Officer Underwood asked Cortinas additional questions because he was unsure

7    whether Cortinas "was talking about a real crime" and not simply making up a story based on

8    information he had heard on the news. ECF No. 10-15 at 15, 26. Accordingly, the state district

9    court reasonably noted that Officer Underwood's questions about the murder were not made with

10   a belief that Cortinas was actually confessing to a murder but were simply made to determine

11   whether a suicidal, distraught individual was "ranting or raving" about something he saw on

12   television. ECF No. 11-5 at 12. As such, it cannot be determined that Officer Underwood should

13   have known that his follow-up questions to Cortinas were "reasonably likely to elicit an

14   incriminating response." *Innis*, 446 U.S. at 301; *see also Bautista*, 684 F.2d at 1291 (explaining

15   that "the questions asked by the police officers were reasonably related in scope to the

16   justification for the stop. Follow-up questions were made necessary by defendants' unconvincing

17   and suspicious answers to the initial, routine questions"). Thus, because it cannot be determined

18   that Cortinas was subject to a "custodial interrogation" prior to being given his *Miranda* rights,

19   *Miranda*, 384 U.S. at 444, the state district court reasonably declined to suppress Cortinas'

20   confession.

21        Cortinas also argues that the police "use[d] an unconstitutional two-step tactic in an

22   attempt to get around *Miranda*'s requirements." ECF No. 50 at 37. The United States Supreme

23   Court has held that a "midstream recitation of warnings after interrogation and unwarned

confession could not effectively comply with *Miranda*'s constitutional requirement," so "a

statement repeated after a warning in such circumstances is inadmissible." *Missouri v. Seibert*,

542 U.S. 600, 604 (2004); *see also Reyes v. Lewis*, 833 F.3d 1001, 1029 (9th Cir. 2016) ("[I]f

officers deliberately employ the two-step technique employed in *Seibert*, and if insufficient

curative measures are taken to ensure that later *Miranda* warnings are genuinely understood, any

warned statement thereby obtained must be suppressed, even if the statement is voluntary."). It

does not appear to this Court that this two-step tactic was used against Cortinas. Until Officers

Reese and Underwood were able to verify with Boulder City Police that Cortinas was in fact

talking about an actual crime, they were not persuaded that Cortinas even committed a crime for

which he needed to be given a *Miranda* warning. ECF No. 10-15 at 15, 25, 27. Therefore, this

was not a case where the police purposefully interrogated Cortinas without providing *Miranda*

warnings to get a confession and then attempted to rectify the situation by providing *Miranda*

warnings before obtaining the same confession. Instead, Officers Reese and Underwood were

questioning Cortinas about his reasons for wanting to commit suicide and, upon confirming that

Cortinas was confessing to an actual crime, provided *Miranda* warnings before speaking with

him further.

Turning to Cortinas' second contention, he asserts that he was unable to voluntarily

waive his *Miranda* rights due to his alcohol consumption, mental distress, sleep-deprivation, low

IQ, low developmental disabilities, and youth. ECF No. 6 at 22. A "defendant may waive

effectuation of [his or her] rights, provided the waiver is made voluntarily, knowingly, and

intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Lego v. Twomey*, 404 U.S.

477, 478 (1972) (the admission into evidence at trial of an involuntary confession violates a

defendant's right to due process under the Fourteenth Amendment); *Dickerson v. United States*,

530 U.S. 428, 444 (2000) (explaining that the requirement that *Miranda* rights be given prior to a custodial interrogation does not dispense with a due process inquiry into the voluntariness of a confession). A determination whether an accused's "statements obtained during custodial interrogation are admissible" is "made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979).

The totality of the circumstances includes "both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."); *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (explaining that the following are potential factors to look to in determining, based on a totality of the circumstances, whether a confession was voluntary: the element of police coercion; the length, location, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; whether the defendant was advised of his rights; and whether counsel was present). Regarding the accused's characteristics, an inculpatory statement is voluntary if it is the product of rational intellect and free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). And regarding the interrogation, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Although a defendant's mental state is a "significant factor in the 'voluntariness' calculus,'" it "does not justify a conclusion that a

1    defendant's mental condition, by itself and apart from its relation to official coercion, should

2    ever dispose of the inquiry into constitutional 'voluntariness.'" *Id.* at 164.

3        The state district court reasonably determined that Cortinas' waiver of his *Miranda* rights

4    was voluntary. Cortinas contends that he involuntarily waived his rights due to his alcohol

5    consumption, mental distress, sleep-deprivation, low IQ, low developmental disabilities, and

6    youth. ECF No. 6 at 22. However, the evidence Cortinas presented to the state district court

7    concerning his characteristics at the time of his confessions focused on his alcohol consumption.

8    And although Cortinas had alcohol in his system at the time of his interviews with Officer

9    Underwood and Detective Thowsen, *see* ECF No. 10-15 at 119-120, Officer Underwood and

10   Detective Thowsen both testified that Cortinas did not appear to be under the influence of

11   alcohol and was articulate and oriented during his interviews. *Id.* at 16-17, 37, 39.

12       Further, even if Cortinas had consumed alcohol before his confession, was distraught and

13   threatening to harm himself, had not slept the night before, and had a low intelligence level,

14   these characteristics are not enough to show that his waiver was involuntary in light of the other

15   details of the interrogation. *See Dickerson*, 530 U.S. at 434. Indeed, Cortinas indicated twice that

16   he understood his *Miranda* rights: once while Officers Reese and Underwood were questioning

17   him outside his residence after verifying with the Boulder City Police that Cortinas had

18   committed an actual crime, and once before his formal police interview with Detective Thowsen.

19   ECF No. 10-15 at 15-16, 36-37. Further, Cortinas' formal police interview last only an hour and

20   35 minutes, ECF No. 10-15 at 51, and occurred within a few hours of his interviews with

21   Officers Reese and Underwood outside his residence. Moreover, importantly, Cortinas does not

22   demonstrate any "coercive police activity." *Connelly*, 479 U.S. at 167. Accordingly, based on

23   "the totality of the circumstances surrounding the interrogation," *Fare*, 442 U.S. at 724–25, it

1   cannot be concluded that Cortinas' waiver of his rights was anything but voluntary, knowing,

2   and intelligent. *Miranda*, 384 U.S. at 444.

3        Because the state district court reasonably declined to suppress Cortinas' confessions and

4   the Nevada Supreme Court reasonably affirmed this denial, Cortinas is denied federal habeas

5   relief for Ground 2.

6        **C.      Ground 3**

7        In Ground 3, Cortinas alleges that his federal constitutional rights were violated because

8   the jury venire did not represent a fair cross section of the community in violation of his Sixth

9   and Fourteenth Amendment rights. ECF No. 6 at 23. Cortinas explains that the venire included

10  only seven Hispanic prospective jurors out of a 68-member venire. *Id.* By this count, Hispanic

11  prospective jurors made up only about 10 percent of the venire even though the Hispanic

12  population in Clark County made up about 26.1 percent of the total population at the time of his

13  trial. *Id.* Cortinas argues that the Clark County jury selection process systematically excluded

14  racial minorities, including Hispanics, because Clark County drew its jury pool only from

15  records from the Department of Motor Vehicles ("DMV"), a service that tends to be used by

16  higher-income individuals. *Id.* at 24. The Respondents contend that Cortinas fails to identify the

17  racial composition of other jury venires drawn in Clark County around the time of his trial, to

18  present any evidence about the racial composition of Clark County's master jury wheel from

19  which the venire was randomly drawn, and to cite to any evidence that Hispanics were

20  unreasonably unrepresented in Clark County's DMV records. ECF No. 45 at 17.

21       In Cortinas' appeal of his judgment of conviction, the Nevada Supreme Court explained

22  that "Cortinas also raise[d] a fair-cross-section challenge based on the allegedly

23  underrepresented Hispanic composition of his venire." ECF No. 13-28 at 31 n.76. However, after

1    "[h]aving carefully considered th[is] contention[ ], [the Nevada Supreme Court] conclude[d] that

2    [it did not] warrant reversal." *Id.* Because the Nevada Supreme Court's opinion "does not come

3    accompanied with [the] reasons" why it denied this ground, this Court "'look[s] through' the

4    unexplained decision to the last related state-court decision that does provide a relevant

5    rationale." *Wilson*, 138 S.Ct. at 1192. This Court "then presume[s] that the unexplained decision

6    adopted the same reasoning." *Id.*

7        During the second day of Cortinas' trial before the jury was sworn in, Cortinas

8    challenged the jury venire. ECF No. 11-5 at 169. Following argument by the parties, the state

9    district court indicated that it had "eleven questionnaires involving African Americans, Pacific

10   Islanders or Asians" and "eight to nine Hispanic individuals." *Id.* at 178. The state district court

11   then indicated that it "can't control who actually shows up" and held that it was "not satisfied

12   that" a new panel was required. *Id.*

13       "[T]he Sixth Amendment entitles every defendant to object to a venire that is not

14   designed to represent a fair cross section of the community." *Holland v. Illinois*, 493 U.S. 474,

15   477 (1990) (explaining that "[t]he Sixth Amendment requirement of a fair cross section on the

16   venire is a means of assuring, not a representative jury (which the Constitution does not

17   demand), but an impartial one (which it does)"); *see also Taylor v. Louisiana*, 419 U.S. 522,

18   538 (1975) ("[P]etit juries must be drawn from a source fairly representative of the

19   community."). The United States Supreme Court has established the following requirements for

20   establishing a prima facie violation of the fair-cross-section requirement:

21       In order to establish a prima facie violation of the fair-cross-section requirement,
         the defendant must show (1) that the group alleged to be excluded is a "distinctive"
22       group in the community; (2) that the representation of this group in venires from
         which juries are selected is not fair and reasonable in relation to the number of such
23       persons in the community; and (3) that this underrepresentation is due to systematic
         exclusion of the group in the jury-selection process.

1    *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Under the third prong, "[a] showing that a jury

2    venire underrepresents an identifiable group is, without more, an insufficient showing of

3    systematic exclusion." *See Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004).

4           Although Cortinas meets the first *Duren* prong, *see United States v. Esquivel*, 88 F.3d

5    722, 726 (9th Cir. 1996) ("Hispanics have been recognized as a 'distinctive,' 'cognizable' group

6    for purposes of the fair cross-section analysis"), and may meet the second *Duren* prong, Cortinas

7    fails to demonstrate that Hispanics were systematically excluded from the venire. *Duren*, 439

8    U.S. at 364. Cortinas only cites his appellate opening brief and appellate reply brief for his

9    contention that "DMV records are under-representative of minorities (such as Hispanics), who

10   on average are less likely to have the means to afford cars." ECF No. 50 at 51; ECF No. 6 at 24.

11   In his appellate opening brief, Cortinas cited a newspaper article, which "discussed a 1993

12   report, by the Nevada Appellate and Postconviction Project, which found 'a statistically

13   significant disparity between the proportion of members of racial minorities in the adult

14   population and the proportion appearing in jury venires.'" ECF No. 13-17 at 25. However,

15   Cortinas then explained that a "subsequent independent audit found no conclusive evidence" of

16   such a disparity. *Id.* And in his appellate reply brief, Cortinas cites to an amici curiae brief in a

17   Nevada Supreme Court case, *Walker v. Nevada*, which explains that "'[t]here are simply no

18   [available] data on the race or ethnicity of any potential juror in the selection process'" in Clark

19   County. ECF No. 13-22 at 11 (second alteration in original).

20          This Court acknowledges that Clark County changed its juror selection process following

21   Cortinas' trial. In fact, in 2007, a year after Cortinas' trial took place, Clark County started using

22   public utility records, in addition to DMV records, "for use in the selection of jurors." Nev. Rev.

23   Stat. § 704.206(1). However, this statutory change along with Cortinas' citations to a newspaper

article's discussion of a report by the Nevada Appellate and Postconviction Project, which was not found to be conclusive by an internal audit, and to an amici curiae brief explaining the lack of juror data, cannot be considered sufficient evidence showing a relationship between the alleged low percentage of Hispanics in his venire and Clark County's juror-selection process. *See Randolph*, 380 F.3d at 1141-42 (9th Cir. 2004) (concluding that "[b]ecause Randolph has not shown any relationship between the disproportionately low percentage of Hispanics in the venire and the juror-section system the County uses, we cannot conclude that the underrepresentation of Hispanics is, as *Duren* requires, 'inherent in the particular jury-selection process'").

Accordingly, the state district court reasonably denied Cortinas' challenge to the venire and the Nevada Supreme Court reasonably affirmed this denial. As such, Cortinas is denied federal habeas relief for Ground 3.[1]

## V.     CERTIFICATE OF APPEALABILITY

This is a final order adverse to Cortinas. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Therefore, this Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the

---

[1] Cortinas requested that this Court "[c]onduct an evidentiary hearing at which proof may be offered concerning the allegations in [his] amended petition and any defenses that may be raised by respondents." ECF No. 6 at 25. Cortinas fails to explain what evidence would be presented at an evidentiary hearing. Additionally, this Court has already determined that Cortinas is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying relief. Thus, Cortinas' request for an evidentiary hearing is denied.

1   merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

2   assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473,

3   484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a

4   COA will issue only if reasonable jurists could debate (1) whether the petition states a valid

5   claim of the denial of a constitutional right and (2) whether the court's procedural ruling was

6   correct. *Id.*

7          Applying this standard, this Court finds that a certificate of appealability is warranted for

8   Ground 1. Although this Court's review of the record demonstrates that Cortinas' killing of the

9   victim was willful, deliberate, and premeditated, reasonable jurists could debate whether the jury

10  actually convicted Cortinas on this theory of liability as opposed to the invalid felony-murder

11  theory of liability. *See Riley*, 786 F.3d at 726. Indeed, because Cortinas admitted to killing the

12  victim and to taking her property after the murder, the jury could have convicted him under the

13  invalid—and, thus, irrefutable—felony-murder theory of liability, rather than the contested

14  premedition theory of liability. Therefore, reasonable jurists could debate whether the state

15  district court's failure to give Cortinas' felony-murder instruction was harmless. The

16  reasonableness of this debate is supported by the fact that a general verdict form was used and by

17  the fact that the State argued, in part, for the jury to convict Cortinas on the felony-murder theory

18  of liability.[2] *See Riley*, 786 F.3d at 727 ("Because the prosecutor relied on [the erroneous

19  instruction] in his closing argument, repeatedly returning to the language of the instruction itself

20

---

21          [2] The State made the following argument in its closing statement: "during the use of that
    force or afterwards taking advantage of that killing he takes [his money] back, and it's still a

22  robbery, it's still a felony murder, and the defendant is guilty either way of first-degree murder
    under the felony-murder rule." ECF No. 12-5 at 78-79. The State also argued, "[defense counsel]

23  suggested to you that the taking of the earrings and the car and the money was an afterthought,
    and it may have been. But the instructions tell you and the law is that when you take
    something . . . it's still a robbery." *Id.* at 114.

in arguing the [invalid] premediated murder theory, and because the general verdict of guilt does not allow us to determine that the jury based its conviction on a different theory, the error was not harmless."); *see also Babb*, 719 F.3d at 1035 ("When reviewing convictions, however, this Court is limited in its ability to decipher a verdict, and cannot simply substitute its judgment for that of the fact finder. General verdict forms can further blur an already opaque decisionmaking process, leaving us with the sort of grave doubt that prevents us from concluding an error was harmless."). This court declines to issue a certificate of appealability for its resolution of Cortinas' other two grounds for habeas relief.

## VI.    CONCLUSION

IT IS THEREFORE ORDERED that the Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 6) is denied.

IT IS FURTHER ORDERED that Petitioner is granted a certificate of appealability for Ground 1. It is further ordered that a certificate of appealability is denied as to Petitioner's remaining grounds.

IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED this 9th day of June, 2020.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE